UNITED STATES, Appellee

v.

Bruce E. GOOCH, Lieutenant Colonel
U.S. Air Force, Appellant

No. 10-0251

Crim. App. No. 37303

United States Court of Appeals for the Armed Forces

Argued November 3, 2010

Decided February 9, 2011

BAKER, J., delivered the opinion of the Court, in which EFFRON,
C.J., and ERDMANN, J., joined. STUCKY, J., filed a separate
opinion dissenting in part and concurring in the result, in
which RYAN, J., joined.

<u>Counsel</u>

For Appellant: Captain Reggie D. <u>Yager</u> (argued); <u>Major Shannon
A. Bennett</u>, <u>Major Michael A. Burnat</u>, and <u>Major Darrin K. Johns</u>
(on brief).

For Appellee: Major Naomi N. <u>Porterfield</u> (argued); <u>Colonel Don
M. Christensen</u>, <u>Lieutenant Colonel Jeremy S. Weber</u>, <u>Major
Coretta E. Gray</u>, and <u>Gerald R. Bruce</u>, Esq. (on brief).

Amicus Curiae for Appellant: <u>Michael Zisser</u> (law student)
(argued); <u>Frank Gulino</u>, Esq. (supervising attorney) and <u>Michael
Levin</u> (law student) (on brief) -- for the Hofstra University
School of Law.

Military Judge: William M. Burd

<u>**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION**</u>.

United States v. Gooch, No. 10-0251/AF

Judge BAKER delivered the opinion of the Court.

At a general court-martial convened at Sheppard Air Force Base, Texas, a panel composed of officer members convicted Appellant, contrary to his pleas, of one specification of making a false official statement, three specifications of engaging in conduct unbecoming an officer and a gentleman, and one specification of fraternization, in violation of Articles 107, 133, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907, 933, 934 (2006). The adjudged and approved sentence consists of a dismissal and a reprimand.

On review, the United States Air Force Court of Criminal Appeals affirmed. United States v. Gooch, No. ACM 37303, 2009 CCA LEXIS 414, at *23, 2009 WL 4110962, at *8 (A.F. Ct. Crim. App. Nov. 24, 2009).

We granted review of the following three issues:[1]

> I. WHETHER THE PROCESS FOR SELECTING PANEL MEMBERS FOR APPELLANT'S GENERAL COURT-MARTIAL WAS IMPROPER IN LIGHT OF ARTICLE 25, UCMJ, AND UNITED STATES v. BARTLETT, 66 M.J. 426 (C.A.A.F. 2008).
>
> II. WHETHER APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN, AFTER THE MILITARY JUDGE LEARNED DURING SENTENCING DELIBERATIONS THAT THE MEMBERS HAD IMPROPERLY RECONSIDERED A FINDING OF NOT GUILTY TO SPECIFICATION TWO OF THE ADDITIONAL CHARGE, AND AFTER

---

[1] Oral argument in this case was heard at the Hofstra University School of Law, Hempstead, New York, as part of the Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

> STATING THAT HE WAS INCLINED TO DISMISS THE SPECIFICATION IN ORDER TO CURE THE ERROR, APPELLANT'S TRIAL DEFENSE COUNSEL URGED THE MILITARY JUDGE NOT TO DISMISS THE SPECIFICATION.
>
> III. WHETHER THE LOWER COURT ERRED IN HOLDING THAT THE DOCTRINE OF "WAIVER" AND "INVITED ERROR" BARRED CONSIDERATION OF APPELLANT'S CLAIM OF INEFFECITVE ASSISTANCE OF COUNSEL.

For the reasons set forth below, we conclude that the process used for screening panel members for Appellant's court-martial was inconsistent with Article 25, UCMJ. However, Appellant did not suffer material prejudice to a substantial right; as required by law he was tried by a fair and impartial panel, including one free from racial bias or taint. Further, we conclude based on the particular facts of this case and applicable Strickland standards, that Appellant did not receive ineffective assistance of counsel in the context of Issue II. As a result, we need not reach the third issue.[2] Therefore, we affirm the United States Air Force Court of Criminal Appeals.

I. BACKGROUND

A. Member Selection

Appellant was charged with inter alia six counts of making unwanted sexual advances on five female servicemembers, including four enlisted servicemembers and one subordinate officer under his command, between July 2005 and May 2007. At

---

[2] We note, however, that an appellant cannot waive a claim of ineffective assistance of counsel where waiver is based on the very advice he asserts was ineffective.

the time of the alleged incidents, Appellant, an African American Lieutenant Colonel (Lt Col), was the Mission Support Squadron (MSS) Commander in the 82d Training Wing (82 TRW), Sheppard Air Force Base (AFB), Texas. Both wings at Sheppard AFB, the 82 TRW and the 80th Flying Training Wing (80 FTW), form part of the Second Air Force (2 AF), headquartered at Keesler AFB, Mississippi. The Commanding General 2 AF is the general court-martial convening authority (CA) for these two wings.

As part of the "general process" of member selection, the 82 TRW military justice section developed a pool of potential panel members for the CA's consideration by asking each unit to provide a list of nominees consisting of their "most qualified individuals" (quarterly list). In the case of an officer-accused, once the pool was generated, the military justice section would initially screen the quarterly list based on availability, grade and rank before forwarding the remaining nominees to the CA for consideration. According to the testimony of Sergeant Martin, the noncommissioned officer in charge (NCOIC) of the 82 TRW military justice section, 2 AF had a written policy requiring 82 TRW to forward a list of "12 to 14 members" to the CA for consideration.

In this case, the quarterly list contained an "insufficient" number of officers outranking Appellant to forward to the CA. As a result, the NCOIC then obtained a

4

master list of all members of grade "O-5 and above with the date of rank prior to [Appellant]" from both wings (master list). The master list contained forty-six officers, four of whom were African Americans.  In the words of the NCOIC:

> Because of the rank of the accused, we [the military justice section] were concerned about the existing [quarterly] list of members that we had. . . .  So the concern was the date of rank and the actual O-5 list that we have wasn't sufficient for sending forward, and there were other concerns regarding knowledge -- possible conflicting knowledge of the case or maybe a personal relationship with Lieutenant Colonel Gooch and his -- by virtue of his status as the MSS Commander.

In response, the NCOIC contacted the military justice office at 2 AF for guidance.  The staff at 2 AF shared the NCOIC's concern, but only as to 82 TRW.  The staff at 2 AF and the NCOIC at 82 TRW then came to a "group decision" to limit the availability check of potential members from 82 TRW to those who arrived on base after Appellant's date of deployment.  This reduced the number of potential members on the master list to seventeen, including one of the previously listed African American officers.  Subsequently, in accordance with standard operating procedure, the NCOIC checked on the potential availability of this pool of officers.  Seven of the seventeen potential members indicated they would not be available when the NCOIC informed them that the trial date was "unknown" and would be "sometime in the spring time frame."  With only ten names

remaining, the NCOIC again asked the staff at 2 AF for guidance. According to Sergeant Martin, 2 AF told her to "[s]end us what you have and we will supplement." She did so. The ten names were forwarded to the CA who personally selected nine officers by initialing next to those officers names. The selected officers included the remaining African American officer. In addition, the CA made a substantive correction to the memorandum, which he initialed.

The trial date was not set until after Appellant's Resignation in Lieu of Decision was processed. This was denied sometime in April 2008. When the NCOIC subsequently contacted the nine remaining members with a trial date in June 2008, the remaining African American officer and one other officer were no longer available.[3] The CA then supplemented the list with additional names from Lackland AFB and Maxwell AFB.[4]

### B. Specification 2 of the Additional Charge

After the president of the panel announced the panel's findings in open court, he informed the military judge that a member had proposed reconsideration of the finding to Specification 2 of the Additional Charge (Specification 2).

---

[3] The African American officer, Lt Col Linscomb, requested to be released from service as she had nonrefundable tickets to attend her son's high school graduation.

[4] The supplements initially included six names from Lackland AFB and one name from Maxwell AFB.

This would have resulted in an improper reconsideration of the findings under Rule for Courts-Martial (R.C.M.) 924. In response, the parties held an R.C.M. 802 conference, attended by Appellant, in which the military judge indicated he was inclined to dismiss Specification 2 and instruct the members to disregard it in their sentencing deliberations. The military judge also indicated, however, that, "If any one or more members said they couldn't disregard it, then I would declare a mistrial as to sentencing and we'd get a new panel." The military judge ultimately decided not to dismiss Specification 2 based on the following discussion between the military judge, defense counsel, and Appellant:

Military Judge: What would you like to do?

Defense Counsel: Your Honor, . . . this just does not rise to the level of impinging upon Colonel Gooch's constitutional rights. It appears the members were conscientious, did the best they could, and they came up with a finding, and we are not requesting that you dismiss Specification 2 of the Additional Charge. And we would like them to continue with their proceedings on sentencing and their deliberations.

Military Judge: And Lieutenant Colonel Gooch, are you in agreement with the position your counsel has just stated?

Appellant: Yes, sir.

Military Judge: . . . Is this a waiver of appellate consideration of any error involved in this?

Defense Counsel: Your Honor, off the cuff, the potential is that some things are waived and other issues on appeal are not waived, of course, so we do not want you to dismiss

Specification 2 of the Additional Charge, nor are we requesting that you dismiss it.

## II.  DISCUSSION

### A.  Panel Selection Under Article 25, UCMJ

"'As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel.'"  United States v. Downing, 56 M.J. 419, 421 (C.A.A.F. 2002) (quoting United States v. Wiesen, 56 M.J. 172, 174 (C.A.A.F. 2001)).  These rights are upheld through application of selection criteria contained in Article 25, UCMJ, as well as the use of peremptory and causal challenges during voir dire.  Voir dire is the principal legal instrument used to ensure that those members who qualify for service as panel members can do so free from conflict and bias.  R.C.M. 912(f)(1)(N), for example, provides, "[a] member shall be excused for cause whenever it appears that the member:  Should not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." (emphasis added).  Examples of scenarios under subsection (N) that may be grounds for challenge include where a member "has a decidedly friendly or hostile attitude toward a party."  R.C.M. 912(f)(1)(N) Discussion (emphasis added); see also United States v. Hollings, 65 M.J. 116, 119 (C.A.A.F. 2007)

8

United States v. Gooch, No. 10-0251/AF

("We have enjoined military judges to follow the liberal grant mandate in evaluating challenges for cause.").

Article 25(a), UCMJ, generally provides that "[a]ny commissioned officer on active duty is eligible to serve on all courts-martial." Section 25(d), however, delimits this eligibility. Subsection (d)(1) provides that members junior in rank or grade to the accused are ineligible to serve "[w]hen it can be avoided." Subsection (d)(2) further provides that a member is per se ineligible "when he is the accuser or a witness for the prosecution or has acted as investigating officer or as counsel in the same case." It is intuitive that other relationships might similarly disqualify an otherwise eligible officer during the screening process, such as the parent of a victim. From among officers eligible to serve on a court-martial panel, "the convening authority shall detail as members thereof such members . . . as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Article 25(d)(2), UCMJ. Although the CA must personally select the court-martial members, he or she may rely on staff and subordinate commanders to compile a list of eligible members. United States v. Dowty, 60 M.J. 163, 169-70 (C.A.A.F. 2004).

The operation of Article 25, UCMJ, is further informed by case law. As a starting point, this Court has identified three

principles that should inform the screening of servicemembers for court-martial service: (1) "we will not tolerate an improper motive to pack the member pool," (2) "systemic exclusion of otherwise qualified potential members based on an impermissible variable such as rank[, race, or gender] is improper," and (3) "this Court will be deferential to good faith attempts to be inclusive and to require representativeness so that court-martial service is open to all segments of the military community." Dowty, 60 M.J. at 171.

Appellant, relying on this Court's opinion in United States v. Santiago-Davila, 26 M.J. 380 (C.M.A. 1988), argues that as a result of the screening methodology used in his case "a cognizable racial group was impermissibly excluded in violation of Appellant's due process rights under the Fifth Amendment." Brief for Appellant at 13, United States v. Gooch, No. 10-0251 (C.A.A.F. May 26, 2010). He further argues more generally that the process used to screen his panel violated Article 25, UCMJ, and resulted in an unfair panel. Id. at 14.

1. The Selection Process in Appellant's Case

Whether a panel has been properly selected is a question of law reviewed de novo. Dowty, 60 M.J. at 171. This Court is bound by the military judge's findings of fact unless they are "clearly erroneous." Id.

In this case, the NCOIC compiled a list of eligible members for consideration by the CA based on four screening criteria: date of rank and grade, availability, "possible personal . . . knowledge of the case," and "maybe a personal relationship" with Appellant, or in the words of the military judge "the best chance of not having any personal knowledge of the accused."

Screening potential members of junior rank or grade is not only proper; it is required by Article 25(d)(1), UCMJ. Further, although not enumerated as an express criterion in Article 25, UCMJ, availability in the military context is an appropriate screening factor. This is implicit in the overall structure of the UCMJ, which is intended to "promote justice" as well as "to assist in maintaining good order and discipline" in an operational context. Manual for Courts-Martial, United States pt. I, para. 3 (2008 ed.) (MCM). It is also reflected in the language of Article 25(d)(1), UCMJ, contemplating that there may be circumstances, not at issue here, where service by officers junior to an accused "cannot be avoided." For these reasons, our case law also recognizes "availability" as a valid consideration in member selection. See Wiesen, 56 M.J. at 176. However, "availability" cannot be used to mask exclusion or evade Article 25, UCMJ, criteria. And, where necessary or appropriate, it is also subject to judicial review at the trial

11

level, as was done in this case with respect to the two officers excused from service based on scheduling conflicts.

However, the question remains whether it was proper for the NCOIC at Sheppard AFB/military justice to screen-out potential members based on "possible personal . . . knowledge of the case" as well as "maybe a personal relationship" with Appellant. (Emphasis added).  And, as a distinct question, even if such criteria are permissible, are they permissible where they have the effect of limiting or eliminating the number of African Americans who serve on a court-martial panel?

We first address Appellant's most pernicious allegation that the selection of panel members was designed to exclude members of Appellant's race.  Appellant cites to Santiago-Davila and Batson v. Kentucky in support of his argument.

In Santiago-Davila, a case involving a Puerto Rican accused, the government used its only peremptory challenge to exclude a potential member with a Hispanic surname who was "[r]aised in Puerto Rico."  26 M.J. at 384-86, 391.  The defense requested that the military judge inquire into the basis for the government's "seemingly discriminatory" challenge.  Id. at 385. The military judge declined to do so because no authority existed at that time requiring an inquiry.  Id. at 386.  After the court-martial, but before reaching this Court on appeal, the Supreme Court decided Batson, which held that a defendant may

establish a prima facie case of purposeful discrimination during jury selection based solely on evidence concerning a prosecutor's exercise of a peremptory challenge. 476 U.S. 79, 96 (1986).[5] On appeal, this Court, applying Batson, held that the appellant had established a prima facie case of discrimination, thereby shifting the burden at trial to the government to present a neutral reason for excluding the member in question. Santiago-Davila, 26 M.J. at 391-92.

This case is distinguishable from Santiago-Davila and Batson. Although the screening methodology used had the effect of excluding three of the four eligible African American members from consideration by the CA, there is no evidence in the record of improper motive to "pack the member pool" or to exclude members based on race. Indeed, the record reflects a good faith effort to compile a list of eligible candidates for the convening authority's selection.

The NCOIC for military justice testified that she did not know the racial composition of the potential members on the master list. Neither did the staff at 2 AF advise the NCOIC, directly or indirectly, regarding race, sex, or command experience as categories for inclusion or exclusion on a potential panel. Nor is there evidence in the record that the

---

[5] In Batson, the Supreme Court reviewed the use of peremptory challenges to remove all African American veniremen in a case against an African American accused. 476 U.S. at 96.

staff at 2 AF or the CA intended to exclude African Americans from service.  One African American officer was included in the list of ten sent to the CA and subsequently selected.  Thus, the military judge's factual conclusion "that race was not a factor in the selection of any of the court members or non-selection of any of the court members" is not clearly erroneous.  In short, the methodology used was not intended to exclude African Americans.[6]

However, our inquiry does not end here.  Appellant also argues that the criteria used to screen members violated Article 25, UCMJ, whether they were race-based or not.  Indeed, as Dowty illustrates, while we have not read Article 25, UCMJ, as an exclusive list of criteria by which potential members are screened, we have scrutinized with care criteria that fall outside Article 25, UCMJ, boundaries.  Dowty, for example, involved the "novel" approach of soliciting volunteers to serve

---

[6] Appellant also argues that this case presents a fait accompli and urges this Court to find structural error on that basis. Brief for Appellant, supra at 12-16.  As this case does not present a true fait accompli, we need not accept Appellant's invitation.  See United States v. Marsh, 21 M.J. 445, 449 (C.M.A. 1986) (stating that a fait accompli means that the CA "had no real choice but to appoint . . . the persons who had been recommended by his subordinates").  The staff at 2 AF informed the NCOIC that they would supplement the list of seven, which they in fact did on more than one occasion.  Therefore, the CA retained and exercised some choice in the matter.  Given these holdings, we need not consider Appellant's claims that these were structural errors.  Brief for Appellant, supra at 12-14.

on courts-martial panels as a means to supplement the member pool.  60 M.J. at 166.  This Court, adopting the federal civilian rule against volunteer jurors in United States v. Kennedy, 548 F.2d 608, 609 (5th Cir. 1977), rejected that approach, holding that it injected an irrelevant variable into the procedure established by Congress in Article 25(d)(2), UCMJ, for obtaining a member panel pool.  60 M.J. at 172.

The question here is whether "possible personal . . . knowledge of the case" and possible "personal knowledge of the accused" were appropriate criteria in this case with which to categorically exclude service as a panel member.  (Emphasis added).  We think not.

First, these categories are not express categories provided for by the Congress in Article 25, UCMJ.

Second, the text of R.C.M. 912 reflects the President's intent that the appropriate mechanism for addressing potential bias or knowledge of the case and of the accused is through voir dire.

Third, this point is particularly apt where the category of exclusion is conditional involving only "the possibility" of knowledge, let alone, knowledge that would preclude panel service.  Such selection criteria would act to exclude not only members with negative or positive biases toward an accused but

15

also members with no view one way or the other who could potentially make it through the voir dire process.[7]

   Fourth, the methodology used had the effect of significantly limiting the potential pool of officers from which the CA might apply the Article 25, UCMJ, criteria.  A majority of eligible members from Appellant's base were thereby excluded from consideration.  The screening method in this case excluded twenty-nine of the forty-six eligible officers on the master list.  Once the unavailable members were excluded, a list of only ten officers was forwarded to the CA, who selected nine. For sure, the staff at 2 AF correctly advised the CA that he might reach beyond the list of candidates provided, but they did so without providing the CA with the additional knowledge of how many other officers had been screened out as well as why the CA might not be inclined to look beyond the immediate list.  Thus, rather than aiding the CA, this type of screening might unduly confine the manner in which a CA personally selected those who "in his opinion, are best qualified," as contemplated by Congress in Article 25(d)(2), UCMJ.

---

[7] Thus, contrary to the dissent's assertion, we hold only that, however well-intentioned, the staff cannot exclude an entire class of eligible members based on mere possibilities, not that the staff must include all eligible members nor those with obvious conflicts, United States v. Gooch, __ M.J. __ (4-5) (C.A.A.F. 2011) (Stucky, J., dissenting in part and concurring in the result, in which Ryan J., joined).

16

Fifth, by delimiting the pool of potential members in this way the Government arguably although not purposefully afforded itself the opportunity in effect to peremptorily challenge any officer at 82 TRW who might know Appellant and have a favorable view of Appellant's professional service.  That alone is not grounds for causal challenge.  See Downing, 56 M.J. at 421-23.  Thus voir dire as provided for in Article 41, UCMJ, and regulated by the President under R.C.M. 912, is the codal method for identifying and screening members based on potential bias, not categorical exclusion.  Voir dire provides an accused (and the government) with the necessary safeguards in the form of unlimited challenges for cause based on actual or implied bias and the liberal grant mandate on the record and supervised by the military judge.[8]

For these reasons, we hold that possible personal knowledge of the case or the accused, based on contemporaneous service alone, is not a proper basis for screening potential members under Article 25, UCMJ.  The government is not entitled to

---

[8] These safeguards were carefully applied by the military judge in this case.  For example, in dismissing Lt Col C., the military judge stated:

> I have enough concern, based on everything he said, that there's at least a real potential for implied bias.  And, given the liberal grant mandate of the appellate courts, I'm not interested in getting this case reversed because of my failure to properly employ the liberal grant mandate, as viewed by the appellate courts.  The defense challenge for cause is granted.

exclude all potential members who might have a favorable (or unfavorable) view of an accused based on prior professional contact. "[M]aybe a personal relationship" and "any personal knowledge of the accused" are not Article 25, UCMJ, criteria. The mechanism for addressing bias, the potential for bias, or the appearance of bias, is through voir dire and the use of causal and peremptory challenges.

## 2. Prejudice

Having found nonconstitutional error in the application of Article 25, UCMJ, we must determine if the error "materially prejudiced the substantial rights of the accused." Article 59(a), UCMJ. Appellant asks this Court to set aside the charges and specifications. Brief for Appellant, supra at 22. The burden of persuasion depends on the nature of the error.

In United States v. Bartlett, this Court identified three categories of nonconstitutional error and their corresponding burdens. 66 M.J. 426, 430 (C.A.A.F. 2008). First, in the case of administrative mistake, the appellant must demonstrate prejudice. Id. Second, where the government has intentionally included or excluded a class of eligible members, the government must demonstrate lack of harm. Id. Third, in the case of unlawful command influence, the government must prove beyond a reasonable doubt that the error was harmless. Id.

18

Although the line between each category can be vague, in this case it is clear. The Government excluded a class of potential members from Appellant's court-martial, based on dates of service at Sheppard AFB, because such persons might have knowledge of the case or knowledge of Appellant. This was more than a ministerial mistake, such as the omission of an Article 25, UCMJ, factor, or an intended name in a memorandum. It was a categorical exclusion based on dates of service at Sheppard AFB. But Appellant has not demonstrated that the error was generated by unlawful command effort to influence the racial composition of the panel nor to "pack the panel" with a command perspective.[9] Thus, the burden rests with the Government to show lack of harm. Id.

We conclude that the Government has sustained this burden. The error in this case did not materially prejudice Appellant's right to a fair and impartial panel for two reasons. First, the Article 25, UCMJ, criteria were applied to the potential pool of members forwarded to the CA. Appellant does not argue otherwise. The SJA in this case advised the CA that "you may select court members from the list submitted by 82TRW/CC or you may select others as you deem appropriate" and "you should select members who, in your opinion, are best qualified for

---

[9] The military judge found that "there has been no unlawful command influence" in this case. Moreover, this is not an issue on appeal to this Court.

court-martial duty by reason of age, education, training, experience, length of service and judicial temperament." The record reflects that the CA personally selected the members. Indeed, he made a handwritten correction to the text of the memo in addition to initialing by certain, but not all, of the names. The CA signed his initials next to nine of the ten members presented to him from Sheppard AFB and four of the six presented from Lackland AFB, and continued to select from supplemental lists until arriving at the final detailing order. Thus, Appellant has not demonstrated that the CA was presented with a fait accompli. The CA could continue supplementing the list until he was satisfied with his selections and knew that he could do so.

Second, the panel by which Appellant was tried was fair and impartial. The military judge conducted a rigorous and diligent voir dire process, in which he properly applied the law, including consideration of actual and implied bias. Four of Appellant's five challenges based on implied bias were granted.[10]

### B. Ineffective Assistance of Counsel

The Sixth Amendment guarantees a criminal accused, including military service members, the right to effective assistance of counsel. United States v. Gilley, 56 M.J. 113,

---

[10] The fifth member was later excused based on Appellant's peremptory challenge.

124 (C.A.A.F. 2001). In assessing the effectiveness of counsel we apply the standard set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in United States v. Cronic, 466 U.S. 648, 658 (1984). Gilley, 56 M.J. at 124 (citing United States v. Grigoruk, 52 M.J. 312, 315 (C.A.A.F. 2000)).

This Court "will not second-guess the strategic or tactical decisions made at trial by defense counsel." United States v. Mazza, 67 M.J. 470, 475 (C.A.A.F. 2009). Where an appellant "attacks the trial strategy or tactics of the defense counsel, the appellant must show specific defects in counsel's performance that were 'unreasonable under prevailing professional norms.'" Id. (quoting United States v. Perez, 64 M.J. 239, 243 (C.A.A.F. 2006)). Claims of ineffective assistance of counsel are reviewed de novo. Id. at 474.

This Court applies a three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

United States v. Polk, 32 M.J. 150, 153 (C.M.A. 1991).

Appellant argues that defense counsel was ineffective in deciding not to move to dismiss Specification 2 of the Additional Charge. As noted at the outset, following the members' improper reconsideration of a finding the military judge determined that the appropriate resolution was to dismiss Specification 2 of the Additional Charge and to direct members to disregard that charge in arriving at a sentence. However, the military judge also stated that "if any one or more members said they couldn't disregard it, then I would declare a mistrial as to sentencing and we'd get a new panel and proceed on with sentencing based on the findings that remain."

It was counsel's tactical concern about the prospect of a mistrial that drove his decision not to have the military judge dismiss the additional charge. In his affidavit Major Huygen states "First and foremost," he wanted to avoid a mistrial for sentencing.[11] "I believed at that moment in time that the risk of losing the panel we had worked so hard to shape was simply too great given my assessment that a second panel would have been packed more than the first to achieve a result favorable to the government." Second, and related, counsel "was concerned that a new panel forced to piece together the facts from a cold record in the aftermath of a mistrial would be less sympathetic

---

[11] The affidavit of junior counsel on the case, Captain Emmert, generally concurs.

22

than the one that had actually seen and heard all of the witnesses during findings."

Appellant argues that counsel's concerns do not provide a reasonable explanation because unlawful command influence was not a valid concern and members are presumed to follow the military judge's instructions. Brief for Appellant, supra at 25-28. In addition, Appellant argues that "[u]nder prevailing professional norms," lawyers should try to dismiss all specifications they can. Id. at 26.

Lead trial defense counsel provides several reasonable explanations for avoiding the risk of a mistrial. In the context of this case he did not want to risk "losing the panel we had worked so hard to shape." Moreover, in counsel's view, a new panel "would be less sympathetic" on sentencing "than one that had actually seen and heard all of the witnesses during findings." Although, another attorney might have litigated this issue differently, we cannot say that his conduct falls measurably below the performance expected of ordinary fallible lawyers. Different counsel might have made a tactical choice to rely on the presumption in the law that members can and will follow a military judge's instruction, to wit, to disregard the dismissal of the additional charge. But the military judge himself was not sure what members would do and determined to poll them first. Moreover, the reason for counsel's dilemma,

from his perspective, was that the panel had already failed to follow the military judge's reconsideration instructions, undercutting a presumption that the members would follow the military judge's instructions on disregarding dismissal of the additional charge.

Based on the particular circumstances of this case Appellant has not overcome the presumption that defense counsel acted competently; therefore, we conclude that counsel's decision not to have the military judge dismiss Specification 2 of the Additional Charge did not constitute ineffective assistance of counsel under Strickland.

### III. CONCLUSION

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

STUCKY, Judge, with whom RYAN, Judge, joins (dissenting in part and concurring in the result):

I concur in affirming the judgment of the United States Air Force Court of Criminal Appeals but dissent from the majority's conclusion that the court member selection process employed in this case -- excluding from consideration any officer assigned to Appellant's unit before he was relieved of command or deployed -- was inconsistent with Article 25, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 825 (2006). I disagree with the majority's interpretation of the facts and its conclusions concerning the law governing this issue.

I.

Appellant was the commander, 82d Mission Support Group, a subordinate unit of the 82d Training Wing (82 TRW). The commander, 82 TRW was the special court-martial convening authority. Both organizations are located at Sheppard Air Force Base, Texas, as is the 80th Flying Training Wing (80 FTW). The commander, Second Air Force (2 AF), located at Keesler Air Force Base, Mississippi, was the general court-martial convening authority for all of these units.

The 82 TRW's staff judge advocate's military justice staff (82 TRW/JAM) had a policy of not nominating for selection as court members persons from the same unit as the accused because of the likelihood they would be "conflicted." Because of his

grade and position, the number of officers in the wing who were neither junior in rank nor subordinate to Appellant was not sufficient to provide the number of nominees for general court-martial duty (twelve to fourteen) that the 2 AF commander required.  After consultation, 2 AF/JAM advised 82 TRW/JAM not to nominate any officer who was assigned to the 82 TRW before Appellant "either was relieved of command or deployed."  The convening authority referred the case to trial on December 19, 2007, before a court consisting of four officers from the 82 TRW and five officers from other units at Sheppard Air Force Base. The case was eventually brought to trial under a different court-martial order, which included five officers assigned to Sheppard AFB, three of whom were assigned to the 82 TRW, and six officers within 2 AF that were assigned to other installations.

## II.

"Any commissioned officer on active duty is <u>eligible</u> to serve" on courts-martial.  Article 25(a), UCMJ (emphasis added). "When it can be avoided," no court member should be junior to the accused in rank or grade.  Article 25(d)(1), UCMJ.

> When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, <u>in his opinion, are best qualified for the duty</u> by reason of age, education, training, experience, length of service, and judicial temperament.  No member of an armed force is eligible to serve as a member of a general or special court-martial when he is the accuser or a witness for the

2

> prosecution or has acted as investigating officer or
> as counsel in the same case.

Article 25(d)(2), UCMJ (emphasis added).

Except for the President, a "convening authority's power to appoint a court-martial is one accompanying the position of command and may not be delegated." United States v. Ryan, 5 M.J. 97, 100-01 (C.M.A. 1978); accord United States v. Dowty, 60 M.J. 163, 169 (C.A.A.F. 2004); see Article 140, UCMJ, 10 U.S.C. § 940 (2006) (permitting President to delegate, and provide for subdelegation, any authority vested in him by the UCMJ). Article 25(d)(2) gives the convening authority almost unfettered discretion in selecting court members, as long as he determines they are "qualified" and not otherwise ineligible. Of course, the criteria used to select the members must not violate the Constitution or the Uniform Code of Military Justice. United States v. Witham, 47 M.J. 297, 301 (C.A.A.F. 1997).

This Court has recognized that the convening authority "'must necessarily rely on his staff or subordinate commanders for the compilation of some eligible names.'" Dowty, 60 M.J. at 170 (quoting United States v. Kemp, 22 C.M.A. 152, 155, 46 C.M.R. 152, 155 (1973)). Problems in the court member selection process normally arise not from the actions of the convening authority in detailing the members, but from those of the staff tasked with assembling the list of nominees.

3

III.

The majority opinion correctly notes that our Article 25 jurisprudence is informed by three principles concerning the screening of personnel for court-martial duty:

> (1) "we will not tolerate an improper motive to pack the member pool," (2) "systemic exclusion of otherwise qualified potential members based on an impermissible variable such as rank[, race, or gender] is improper," and (3) "this Court will be deferential to good faith attempts to be inclusive and to require representativeness so that court-martial service is open to all segments of the military community."

United States v. Gooch, __ M.J. __ (10) (C.A.A.F. 2011) (alteration in original) (quoting Dowty, 60 M.J. at 171) (citations omitted).

The opinion acknowledges that the selection criteria listed in Article 25 are not "an exclusive list of criteria by which potential members are screened." Id. at __ (14). It recognizes that, "although not enumerated as an express criterion in Article 25, UCMJ, availability in the military context is an appropriate screening factor." Id. at __ (11); see id. at __ (11) (citing United States v. Wiesen, 56 M.J. 172, 176 (C.A.A.F. 2001)). Similarly, the majority concludes that "[i]t is intuitive that other relationships might similarly disqualify an otherwise eligible officer during the screening process, such as the parent of a victim." Id. at __ (9-10). What about the military spouse of the staff judge advocate, prosecutor, defense

4

counsel, or the accused; others awaiting trial by court-martial;
military witnesses for the defense; and military personnel who
work directly with the accused or the victim on a daily basis?
It is similarly "intuitive" that each of these relationships
might be disqualifying.

The majority incorrectly concludes that, by excluding
officers assigned to the same wing as Appellant before he
deployed, "[a] majority of eligible members from Appellant's
base were thereby excluded from consideration." Id. at __ (16).
The court-martial was convened by the commander, 2 AF, who
commands major units at five installations from which he could
draw court members. Although it is normal practice to obtain
court members from the locus of the trial, it is not at all
unusual in senior officer cases for convening authorities to
detail court members from different installations. A majority
of eligible members within 2 AF were not excluded from
consideration.

The majority also contends that "by delimiting the pool of
potential members in this way the Government arguably although
not purposefully afforded itself the opportunity in effect to
peremptorily challenge any officer at 82 TRW who might know
Appellant and have a favorable view of Appellant's professional
service." Id. at __ (17). There is absolutely no evidence that
the Government had any such motive or that the members excluded

5

were more likely to be favorable than unfavorable to Appellant. In light of the number of officers requested by the 2 AF commander (twelve to fourteen) and the number of eligible officers within the command, the pool was not significantly limited.

In today's high-tempo military, finding officers who will be available some time in the future is often a difficult task. Convening authorities recognize the importance of courts-martial but at the same time want to minimize the disruption the trial will cause to subordinates who are performing their primary military missions. Finding nominees becomes even more difficult when, as here, the accused is a high-ranking officer because the pool of eligible court members not junior in grade is smaller and their military duties and responsibilities tend to be significantly greater.

Convening authorities are also very busy people. If, because of challenges, a court-martial panel falls below quorum after voir dire, the trial must be continued while the convening authority's staff looks for eligible members who are present and whose primary duties are such that they are available to sit on the court-martial. The convening authority must then interrupt his other duties to consider the nominations and select additional members. If, as the majority demands, the convening authority's staff is prohibited from rejecting persons who could

not or most likely would not survive the voir dire and challenge process, convening authorities will have to refer cases to larger court panels -- taking more members away from their primary duty -- or face the prospect of more interruptions, in both the trial and his schedule, to select additional court members.

The goal of Article 25 is to ensure that a military accused is tried before fair and impartial members who understand the need for both justice and military discipline; hence the requirement that the convening authority detail for court-martial duty those military members who, "in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Article 25(d)(2). Although convening authorities have considerable discretion in selecting court members, they expect their staffs to nominate officers according to the law and in a manner that will be least disruptive to performing the primary military mission.

As the Mission Support Group commander, responsible for more than 900 personnel supporting the Air Force's largest technical training wing, and chief advisor to two wings on all civilian and military promotions, hiring, and professional development, Appellant was a vital member of the 82 TRW commander's staff and would necessarily have interacted on a

7

daily basis with all of the senior officers within the wing. Additionally, all of the alleged victims were members of the 82 TRW, in particular, the squadron he commanded.  While voir dire may be the principal legal instrument used to ensure that the members of a court-martial are free from conflict, Gooch, __ M.J. at __ (8-9), it is not the only means to ensure that the court panel to which an accused's case is referred is fair and impartial.  The convening authority was free to select any eligible officer within his command who met Article 25 criteria. The fact that persons who were assigned to the same unit as Appellant and the alleged victims, and who were, therefore, most likely to have had extensive dealings with them, were not considered to sit on his court-martial does not violate either the text nor the spirit of Article 25, our previous jurisprudence, or the holding in United States v. Bartlett, 66 M.J. 426 (C.A.A.F. 2008).

Acknowledging that Article 25 criteria are not the only criteria that may be considered, but unwilling to permit the use of criteria not otherwise prohibited by the Constitution, UCMJ, R.C.M., or case law, the majority adopts an ad hoc approach to conclude that the selection criteria employed here were not appropriate.  It provides no guidance for convening authorities or their staffs in evaluating selection criteria for future cases.